**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| TRADER JOE'S COMPANY, a California Corporation, *Plaintiff-Appellant*, | No. 14-35035 |
| | D.C. No. 2:13-cv-00768-MJP |
| v. | |
| MICHAEL NORMAN HALLATT, an individual, DBA Pirate Joe's, AKA Transilvania Trading, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Senior District Judge, Presiding

Argued and Submitted on June 7, 2016
Seattle, Washington

Filed August 26, 2016

Before: Richard A. Paez. Jay S. Bybee,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

## SUMMARY[*]

### Lanham Act / Extraterritorial Application

The panel affirmed in part and reversed in part the district court's dismissal of trademark infringement and unfair competition claims for lack of subject-matter jurisdiction.

Defendant Michael Norman Hallatt purchased Trader Joe's-branded goods in Washington State, transported them to Canada, and resold them there in a store he designed to mimic a Trader Joe's store. Trader Joe's sued under the Lanham Act and Washington law.

Reversing the dismissal of the Lanham Act claims, the panel held that the extraterritorial reach of the Lanham Act raises a question relating to the merits of a trademark claim, not to federal courts' subject-matter jurisdiction. On the merits, the panel concluded that Trader Joe's alleged a nexus between Hallett's conduct and American commerce sufficient to warrant extraterritorial application of the Lanham Act.

The panel affirmed the dismissal of the state law claims because Trader Joe's did not allege trademark dilution in Washington or harm to a Washington resident or business.

The panel remanded the case to the district court for further proceedings.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Anna-Rose Mathieson (argued), California Appellate Law Group, San Francisco, California; Tim Byron, O'Melveny & Myers LLP, San Francisco, California; Brian M. Berliner and Jordan Raphael, O'Melveny & Myers, LLP, Los Angeles, California; for Plaintiff-Appellant.

Nathan Alexander (argued), Dorsey & Whitney LLP, Seattle, Washington, for Defendant-Appellee.

**OPINION**

CHRISTEN, Circuit Judge:

This trademark infringement case turns on the extraterritorial reach of the Lanham Act. It is uncontested that Defendant Michael Norman Hallatt purchases Trader Joe's-branded goods in Washington state, transports them to Canada, and resells them there in a store he designed to mimic a Trader Joe's store. Trader Joe's sued for trademark infringement and unfair competition under the Lanham Act and Washington state law. The district court recognized that the Lanham Act can apply to conduct that occurs abroad, but it dismissed the Lanham Act claims for lack of subject-matter jurisdiction after concluding that Hallatt's allegedly infringing activity takes place in Canada, and that Trader Joe's did not adequately explain how Hallatt's activity impacts American commerce. The district court dismissed Trader Joe's' state law claims for similar reasons.

We affirm in part and reverse in part. Consistent with recent case law from the Supreme Court and our court, we

hold that the extraterritorial reach of the Lanham Act raises a question relating to the merits of a trademark claim, not to federal courts' subject-matter jurisdiction. On the merits, we conclude that Trader Joe's alleges a nexus between Hallatt's conduct and American commerce sufficient to warrant extraterritorial application of the Lanham Act. We therefore reverse in part. But because Trader Joe's does not allege trademark dilution in Washington or harm to a Washington resident or business, we affirm the court's dismissal of the state law claims.

## BACKGROUND

The complaint alleges that Trader Joe's is a well-known American grocery store that sells specialty goods at reasonable prices from its distinctive, South Pacific-themed stores.[1] It is headquartered in Monrovia, California, but it operates hundreds of stores throughout the United States, including more than a dozen stores in Washington. About eighty percent of the goods Trader Joe's sells in its stores are Trader Joe's-branded products that are available only at Trader Joe's. Trader Joe's does not franchise its intellectual property or license others to sell its products. Trader Joe's maintains strict quality control standards when transporting and storing perishable goods to protect the safety of its customers and to ensure that Trader Joe's stores sell only fresh, high-quality goods. Trader Joe's has rejected offers

---

[1] We take these facts from the complaint and its exhibits. *See Akhtar v. Mesa*, 698 F.3d 1201, 1212 (9th Cir. 2012) ("When reviewing a motion to dismiss we 'consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice.'" (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam))).

from third parties to enter into franchise agreements, in part because of the difficulty of "ensuring that these third parties will ship, handle, and store food products pursuant to Trader Joe's exacting standards." Trader Joe's does not operate outside of the United States, but Canadian consumers regularly travel across the border to shop at Trader Joe's stores located in northern Washington.

Trader Joe's owns several federally registered and common-law trademarks associated with its stores and products. Its family of marks includes a trademark for the red, stylized "Trader Joe's" text, *see* Fig. 1, and numerous trademarks for Trader Joe's-branded products. Trader Joe's also alleges that it has trade dress protection for its South Pacific-themed store design. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775–76 (1992) (recognizing that distinctive store design is a form of trade dress). Trader Joe's carefully cultivates its brand through advertising, promotion, and word-of-mouth referrals, and, according to the complaint, its trademarks and trade dress "have come to symbolize extraordinary goodwill and have achieved great fame both within and outside the United States" due to these efforts. This fame and popularity has generated substantial domestic and international demand for Trader Joe's products.

Fig. 1:

In October 2011, staff members at the Bellingham Trader Joe's store noticed something odd about one of their customers:  Canadian resident Michael Norman Hallatt visited the store several times per week to buy large quantities of Trader Joe's products.[2]  When questioned, Hallatt admitted that he drives the goods he purchases across the Canadian border where he distributes them to Canadian customers.  Trader Joe's later learned from one of its Canadian customers that Hallatt opened a store in Canada named Transilvania Trading (which he later renamed "Pirate Joe's") where he resells, at substantially inflated prices, Trader Joe's goods purchased in Washington.  Trader Joe's alleges that Hallatt uses its intellectual property to solicit business for Pirate Joe's:  He advertises his wares with Trader Joe's trademarks, operates a website accessible from the United States, displays an exterior sign at Pirate Joe's that uses a font similar to the trademarked "Trader Joe's" insignia, Fig. 2, and designed the Pirate Joe's store to mimic Trader Joe's trade dress.  Hallatt sells perishable goods at Pirate Joe's that he does not transport or store in a manner consistent with the strict quality control standards used by Trader Joe's.  Trader Joe's has received at least one complaint from a consumer who became sick after eating a Trader Joe's-branded product she purchased from Pirate Joe's.

---

[2] Bellingham, Washington is located about twenty-five miles from the Canadian border and about sixty miles from Vancouver, British Columbia.

Fig. 2:



Trader Joe's told Hallatt that it does not sanction his activity and demanded that he stop reselling Trader Joe's products from Pirate Joe's. Hallatt refused. Trader Joe's declined to serve Hallatt as a customer, but Hallatt, undeterred, began donning "disguises to shop at Trader Joe's without detection" and driving "to Seattle, Portland, and even California to purchase TRADER JOE'S-branded products and evade Trader Joe's refusal to sell them." The complaint also alleges that Hallatt pays third parties in Washington to buy Trader Joe's goods on his behalf. On appeal, Trader Joe's contends that Hallatt accomplishes his scheme in part because he is a United States Lawful Permanent Resident (LPR), an immigration status that enables him to live and work legally in the United States. All told, Hallatt has spent more than $350,000 purchasing Trader Joe's products to resell in Canada.

Trader Joe's sued Hallatt (doing business as Pirate Joe's) for trademark infringement in the Western District of Washington, invoking that court's federal question and supplemental jurisdiction. 28 U.S.C. §§ 1331, 1367. Trader Joe's alleged that Hallatt violated federal and state trademark and unfair competition laws by misleading consumers "into falsely believing that Pirate Joe's and/or Transilvania Trading have been authorized or approved by Trader Joe's," displaying Trader Joe's trademarks and mimicking Trader Joe's trade dress, and reselling Trader Joe's goods without authorization and without adhering to Trader Joe's' strict quality control practices. According to Trader Joe's, this conduct dilutes its trademarks, confuses consumers, and damages Trader Joe's' reputation by associating it with high-cost, reduced-quality goods. The complaint includes six claims for relief, four of which arise under the Lanham Act and two of which arise under Washington law: (1) federal trademark infringement, 15 U.S.C. § 1114(1); (2) unfair competition, false endorsement, and false designation of origin, 15 U.S.C. § 1125(a)(1)(A); (3) false advertising, 15 U.S.C. § 1125(a)(1)(B); (4) federal trademark dilution, 15 U.S.C. § 1125(c); (5) state trademark dilution, Wash. Rev. Code § 19.77.160; and (6) deceptive business practices in violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020. Trader Joe's asked the district court to award it damages and permanently enjoin Hallatt from reselling its goods or using its trademarks in Canada.

The district court granted Hallatt's motion to dismiss Trader Joe's' federal claims for lack of subject-matter jurisdiction, concluding that the Lanham Act did not apply to Hallatt's conduct in Canada. The court denied Trader Joe's leave to amend its federal claims, but granted Trader Joe's the opportunity to assert an independent jurisdictional basis for

its state law claims. Trader Joe's filed a motion for reconsideration in which it argued that the extraterritorial scope of the Lanham Act is a merits question that does not implicate the district court's subject-matter jurisdiction. The district court denied the motion. Trader Joe's then filed an amended complaint reasserting its state law claims and invoking the district court's diversity jurisdiction. Hallatt filed a motion to dismiss for failure to state a claim, which the district court granted.

The district court entered final judgment on December 18, 2013, and Trader Joe's timely appealed. We have jurisdiction under 28 U.S.C. § 1291.[3]

## DISCUSSION

## A. Lanham Act claims

The Lanham Act is the federal trademark and unfair competition statute. It creates a civil cause of action against "[a]ny person who shall . . . use in commerce any . . . colorable imitation of a registered mark," 15 U.S.C. § 1114(1) (Lanham Act section 32), or "[a]ny person who . . . uses in commerce any" word, false description, or false designation of origin that "is likely to cause confusion . . . or

---

[3] "We review de novo a district court's dismissal for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and a district court's dismissal for failure to state a claim, Fed. R. Civ. P. 12(b)(6)." *Naffe v. Frey*, 789 F.3d 1030, 1035 (9th Cir. 2015). We review for an abuse of discretion a district court's denial of a motion for reconsideration, *see Sch. Dist. No. 1J, Multnomah Cty. v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993), but review de novo any legal conclusions on which the denial was based, *see United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc).

to deceive as to the affiliation," origin, or sponsorship of any goods, *id.* § 1125(a)(1) (Lanham Act section 43). The Act broadly defines commerce as "all commerce which may lawfully be regulated by Congress," *id.* § 1127, and gives federal courts jurisdiction over all claims arising under it, *id.* § 1121(a).

We determine whether any statute, including the Lanham Act, reaches foreign conduct by applying a two-step framework. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). At step one we ask "whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* The Supreme Court settled this question with regard to the Lanham Act when it held that the Act's "use in commerce" element and broad definition of "commerce" clearly indicate Congress's intent that the Act should apply extraterritorially. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 286 (1952). Where, as here, Congress intended a statute to apply extraterritorially, we proceed to step two and consider "the limits Congress has (or has not) imposed on the statute's foreign application." *RJR Nabisco*, 136 S. Ct. at 2101.

We resolve two questions to decide whether the Lanham Act reaches Hallatt's allegedly infringing conduct, much of which occurred in Canada: First, is the extraterritorial application of the Lanham Act an issue that implicates federal courts' subject-matter jurisdiction? Second, did Trader Joe's allege that Hallatt's conduct impacted American commerce in a manner sufficient to invoke the Lanham Act's protections? Because we answer "no" to the first question but "yes" to the second, we reverse the district court's dismissal of the federal claims and remand for further proceedings.

### 1.  Subject-matter jurisdiction

Trader Joe's argues on appeal that the extraterritorial reach of the Lanham Act is a non-jurisdictional merits question, and that the Supreme Court's decision in *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006), abrogated circuit case law suggesting otherwise.  Hallatt counters that this court has long treated the extraterritorial application of the Lanham Act as an issue of subject-matter jurisdiction, and that the panel may not deviate from this precedent.  We agree with Trader Joe's.

When the district court dismissed the federal claims for lack of subject-matter jurisdiction, it did not have the benefit of our recent decision in *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867 (9th Cir. 2014).  There, we held that the Lanham Act's "use in commerce" element (the element that gives the Act extraterritorial reach) is not jurisdictional.  *Id.* at 873–74.  In *La Quinta*, an American hotel chain, La Quinta Worldwide, sued a Mexican competitor, Quinta Real, for trademark infringement after Quinta Real expressed an intent to expand its business into the United States.  *Id.* at 872.  The district court held a bench trial and found in La Quinta's favor.  *Id.*  On appeal, Quinta Real asserted for the first time "that there is no federal subject-matter jurisdiction over this case."  *Id.*  Quinta Real argued that the Lanham Act's "use in commerce" requirement is jurisdictional; its expressions of intent to open a hotel were not sufficient to show a "use in commerce" under the Lanham Act; and that the Ninth Circuit was required to dismiss the appeal for lack of subject-matter jurisdiction.  *Id.*

Our court rejected those arguments.  Citing *Arbaugh*, 546 U.S. at 513–14, we reasoned that "federal courts have

subject-matter jurisdiction over all suits pleading 'a colorable claim "arising under" the Constitution or laws of the United States,' so long as Congress does not clearly indicate otherwise." *La Quinta*, 762 F.3d at 873. Because "the 'use in commerce' element of Lanham Act claims under sections 32 and 43(a) is not connected to the Lanham Act's jurisdictional grant in 15 U.S.C. § 1121(a)," the element "is not a jurisdictional requirement, and we have subject-matter jurisdiction under 15 U.S.C. § 1121(a)." *Id.* at 872–73; *see also Arbaugh*, 546 U.S. at 516 ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.").

Hallatt correctly argues that *La Quinta* is not on all fours with this case because *La Quinta* did not consider the Lanham Act's extraterritorial reach. The parties in *La Quinta* disputed whether Quinta Real's intent to expand its business to the United States constituted "use" within the meaning of the Lanham Act. *See* 762 F.3d at 872; *see also Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 762–63 (8th Cir. 2010) (explaining that the Lanham Act imposes liability for trademark infringement only if there is use of another's mark in commerce). *La Quinta* did not need to address the Lanham Act's extraterritorial scope because Quinta Real's contemplated infringing activity was to occur in the United States. 762 F.3d at 872.

Nevertheless, *La Quinta*'s jurisdictional analysis still dictates the outcome here. As noted, it is the Lanham Act's "use in commerce" element and its broad definition of "commerce" that give the statute extraterritorial reach. *See Steele*, 344 U.S. at 283–84. These are the same elements that the panel considered in *La Quinta*, *see* 762 F.3d at 872–73;

they derive from Congress's power to regulate interstate and foreign commerce under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. *See* 15 U.S.C. § 1114 (applying to marks "use[d] in commerce"); *id.* § 1125 (same); *id.* § 1127 ("The word 'commerce' means all commerce which may lawfully be regulated by Congress."). The constitutional source of this authority is the same whether or not the alleged infringement implicates the extraterritorial scope of the Lanham Act: Congress can no more regulate intra-state, non-commercial possession of another's mark (the issue raised in *La Quinta*) than trademark infringement that occurs entirely outside of the country's borders. *See Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 427–28 (9th Cir. 1977) (analogizing the Lanham Act's application to purely intrastate activities to the Act's application to purely foreign activities). Thus, *La Quinta*'s conclusion that the Lanham Act's "use in commerce" element is not jurisdictional applies here even though *La Quinta* considered the scope of the word "use," rather than the Act's extraterritorial reach.[4]

---

[4] *La Quinta* did not discuss several Ninth Circuit cases that treated the Lanham Act's "use in commerce" requirement as "jurisdictional," but that does not lessen its thrust. *See, e.g.*, *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 554 (9th Cir. 1992); *but see Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 612 (9th Cir. 2010) (post-*Arbaugh* case treating extraterritorial question as a merits question). As explained *infra*, the Supreme Court plainly stated in *Morrison* and *Arbaugh* (which postdate *Reebok*) that whether a statute reaches foreign conduct is a merits question, not a question of jurisdiction. *See Morrison v. Nat'l Aust. Bank, Ltd.*, 561 U.S. 247, 254 (2010) (statute's extraterritorial reach is a merits question); *Arbaugh*, 546 U.S. at 512–13 (criticizing *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991), in which the Court treated the extraterritorial scope of Title VII as an issue of subject-matter jurisdiction). These cases did not expressly consider the Lanham Act, but we see no principled way to exclude the Lanham Act from their holdings, particularly in light of *La Quinta*. Our prior characterization of the

More importantly, *La Quinta* is consistent with recent Supreme Court case law addressing federal courts' subject-matter jurisdiction. *See Morrison v. Nat'l Aust. Bank, Ltd.*, 561 U.S. 247, 253–54 (2010); *Arbaugh*, 546 U.S. at 516. In *Arbaugh*, the Court clarified "the difference between elements of a claim and jurisdictional requirements," *La Quinta*, 762 F.3d at 873, holding that "the numerical qualification contained in Title VII's definition of 'employer' . . . delineates a substantive ingredient of a Title VII claim for relief" and does not "affect[] federal-court subject-matter jurisdiction," *Arbaugh*, 546 U.S. at 503. In *Morrison*, the Court applied *Arbaugh* and held that the extraterritorial reach of the Securities and Exchange Act § 10(b) is a merits question, not a question of federal courts' subject-matter jurisdiction. *See* 561 U.S. at 253–54. Its discussion of the issue is particularly relevant:

> Before addressing the question presented, we must correct a threshold error in the Second Circuit's analysis. It considered the extraterritorial reach of § 10(b) to raise a question of subject-matter jurisdiction, wherefore it affirmed the District Court's dismissal under Rule 12(b)(1). . . .

---

Lanham Act's reach as "jurisdictional" is therefore "irreconcilable with the reasoning or theory" of this higher and more recent authority. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc); *see also United States v. Lindsey*, 634 F.3d 541, 548 (9th Cir. 2011) ("In order to be controlling on the panel, a higher court's decision 'need not be identical' to our precedent, but must instead 'undercut the theory or reasoning underlying the prior circuit precedent . . . .'" (citation omitted)); *id.* at 550 (*Miller* "instructs us to focus on the *reasoning* and *analysis* in support of a holding, rather than the holding alone.").

But to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, "refers to a tribunal's 'power to hear a case.'" It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief. The District Court here had jurisdiction under 15 U.S.C. § 78aa to adjudicate the question whether § 10(b) applies to National's conduct.

*Id.* (citations and footnote omitted). This analysis is equally applicable to the Lanham Act. *See Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 613 (9th Cir. 2010) (explaining the Lanham Act *applies to* defendants' foreign conduct when that conduct impacts American commerce). We hold that the extraterritorial reach of the Lanham Act is a merits question that does not implicate federal courts' subject-matter jurisdiction, and that the district court erred as a matter of law when it decided otherwise.

But this conclusion does not end our work. The district court dismissed Trader Joe's case at the pleadings stage, but as in *Morrison*, "nothing in [its analysis] turned on" the fact that it dismissed the case under Rule 12(b)(1), rather than under Rule 12(b)(6). *Morrison*, 561 U.S. at 254; *see also Arbaugh*, 546 U.S. at 507 (explaining that a merits argument "endures up to . . . trial on the merits"). As explained *infra*, our longstanding *Timberlane* test for the Lanham Act's extraterritorial application applies whether the extraterritorial scope of the statute is a jurisdictional or merits question, so remand to the district court would only "require [it to put] a new Rule 12(b)(6) label [on] the same Rule 12(b)(1)

conclusion." *Morrison*, 561 U.S. at 254. Rather than asking the district court to engage in this exercise, we consider whether the Lanham Act reaches Hallatt's allegedly infringing conduct under the standards set by Rule 12(b)(6).

### 2. *The merits of the Lanham Act*

We next consider the limits, if any, Congress imposed on the Act's extraterritorial application. *See RJR Nabisco*, 136 S. Ct. at 2101 (discussing "step two"). In 15 U.S.C. § 1127, Congress directed that the Lanham Act applies to "all commerce which may lawfully be regulated by Congress." Whether this provision sweeps foreign activities into the Act's proscriptive reach depends on a three-part test we originally applied to the Sherman Act in *Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n*, 549 F.2d 597 (9th Cir. 1976). *See Wells Fargo*, 556 F.2d at 427 (extending *Timberlane* test to the Lanham Act). Under *Timberlane*, the Lanham Act applies extraterritorially if:

> (1) the alleged violations . . . create some effect on American foreign commerce; (2) the effect [is] sufficiently great to present a cognizable injury to the plaintiffs under the Lanham Act; and (3) the interests of and links to American foreign commerce [are] sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority.

*Love*, 611 F.3d at 613.[5]

### a. *Timberlane* prongs one and two

*Timberlane*'s first two prongs require Trader Joe's to allege that Hallatt infringes its trademarks (1) in a way that affects American foreign commerce, and (2) causes Trader Joe's a cognizable injury under the Lanham Act. *Id.* A defendant's foreign activities need not have a substantial or even significant effect on American commerce, rather, "some effect" may be sufficient. *Compare Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*, 701 F.2d 408, 414 n.8 (5th Cir. 1983) (joining the Ninth Circuit in requiring "some effect"), *with Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956) (requiring effect to be substantial); *see also* J. Thomas McCarthy, 5 McCarthy on Trademarks & Unfair Competition § 29:58 (4th ed. 2016) (discussing different tests).

Plaintiffs usually satisfy *Timberlane*'s first and second prongs by alleging that infringing goods, though sold initially in a foreign country, flowed into American domestic markets.

---

[5] Trader Joe's argues that *Timberlane* does not apply here because Hallatt executed part of his infringing scheme in the United States. We have applied *Timberlane* in cases where some of the defendant's conduct was domestic, so long as the entire scheme culminated in infringing activity abroad. *See, e.g.*, *Reebok*, 970 F.2d at 557 (applying *Timberlane* where "Reebok's trademark infringement claim [was] based both on actions that occurred in the United States as well as in Mexico"); *Wells Fargo*, 556 F.2d at 429 ("We note, however, that, when faced with both Mexican and United States activities of an American citizen that were part of one infringing scheme, this court adopted an analysis which at least in part was premised on the need to deal with the extraterritorial nature of defendant's activities."). We follow that same tack here.

*See Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 556 (9th Cir. 1992) (prongs one and two met when defendants "knew that their counterfeit shoes went back into the United States with regular frequency"); *McBee v. Delica Co., Ltd.*, 417 F.3d 107, 125 (1st Cir. 2005) ("Quite commonly, plaintiffs . . . meet their burden by presenting evidence that while the initial sales of infringing goods may occur in foreign countries, the goods subsequently tend to enter the United States in some way and in substantial quantities.").[6]  Trader Joe's does not allege that the Trader Joe's-brand products Hallatt resells from his Canadian store trickle back into American commerce in a manner likely to confuse American consumers.  This fact distinguishes *Steele*, where the Court applied the Lanham Act to a defendant's foreign conduct (his sale of counterfeit watches in Mexico) largely because "spurious 'Bulovas' filtered through the Mexican border into this country."  344 U.S. at 286.  It also undermines Trader Joe's' argument that *Steele* controls the outcome here.  But, as Trader Joe's alternatively argues, whether infringing goods flow into the United States is not dispositive; plaintiffs may show "some effect" on American commerce in myriad ways.  *See, e.g.*, *Am. Rice*, 701 F.2d at 414–15 (applying the Lanham Act to defendant's sale of rice in Saudi Arabia, though the goods did not flow back into United States markets, because defendant's business was located in the United States).

---

[6] *Timberlane* refers to defendant's impact on "American foreign" commerce, *Love*, 611 F.3d at 613, but, as these cases show, we regularly apply the Lanham Act to foreign conduct that impacts *domestic* commerce because infringing goods flow into American domestic commerce streams. *See, e.g.*, *Steele*, 344 U.S. at 286.

Trader Joe's alleges that Hallat's foreign conduct has "some effect" on American commerce because his activities harm its reputation and decrease the value of its American-held trademarks. It argues that Hallatt violates 15 U.S.C. § 1114(a), the Lanham Act's general prohibition on trademark infringement, by transporting and selling Trader Joe's goods without using proper quality control measures or established product recall practices.[7] By framing its allegation this way, Trader Joe's seeks to circumvent the first sale doctrine, which establishes that "resale by the first purchaser of the original article under the producer's trademark is generally neither trademark infringement nor unfair competition." *See Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998). The quality control theory of infringement is cognizable under the Lanham Act notwithstanding the first sale doctrine: "[d]istribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image." *Id.* at 1087 (alteration in original) (internal quotation marks omitted) (recognizing viable claim for Costco's repackaging of plaintiff's figurines, which caused chips and other damage); *see also Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 132–33 (D. Colo. 1980) (enjoining defendant from purchasing Coors beer in Colorado and reselling it in Maryland because defendant did not refrigerate beer during transport and the sale of skunked beer, an inferior product, harmed Coors's

---

[7] The amended complaint alleges that Hallatt stopped selling perishable food pending resolution of this case, but neither party argues that this case is moot, and voluntary cessation of allegedly infringing activities does not moot an appeal. *See Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013) (describing mootness doctrine); *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1130 n.3 (9th Cir. 2005) (same).

reputation), *cited favorably in Enesco Corp.*, 146 F.3d at 1085 n.2, 1087.

According to Trader Joe's, Hallatt's poor quality control practices could impact American commerce if consumers who purchase Trader Joe's-brand products that have been transported to Canada become ill, and news of such illness travels across the border. Trader Joe's alleges this may harm its reputation, reduce the value of its trademarks, and cause lost sales. Trader Joe's argues its risk of harm is particularly high because Pirate Joe's displays Trader Joe's trademarks, which leads consumers to believe that it is an authorized Trader Joe's retailer. There is nothing implausible about the concern that Trader Joe's will suffer a tarnished reputation and resultant monetary harm in the United States from contaminated goods sold in Canada. Incidents of food-born illness regularly make international news,[8] and Trader Joe's alleges that it is aware of at least one customer who became sick after consuming food sold by Pirate Joe's. Courts have held that reputational harm to an American plaintiff may constitute "some effect" on American commerce. *Steele*, 344 U.S. at 286 (applying Lanham Act extraterritorially where "competing goods could well reflect adversely on Bulova Watch Company's trade reputation in markets cultivated by advertising here as well as abroad"); *Gucci Am., Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 143 (S.D.N.Y. 2011) ("It is well-settled that a showing of . . . harm to plaintiff's goodwill in the United States is sufficient to

---

[8] *See, e.g.*, Anita Balakrishnan, *Analysts negative on Chipotle after CDC launches new E.coli investigation*, CNBC (Dec. 22, 2015, 10:28 a.m.), http://www.cnbc.com/2015/12/21/cdc-investigating-another-outbreak-of-different-e-coli-strain-at-chipotle.html ("Shares of Chipotle Mexican Grill dropped more than 4 percent" after news of CDC investigation).

demonstrate a 'substantial effect on United States commerce.'" (quoting *Steele*, 344 U.S. at 286)); *see also* 15 U.S.C. §§ 1114, 1125 (making actionable conduct that is likely to cause future harm).

Hallatt's alleged attempt to pass as an authorized Trader Joe's retailer could similarly harm Trader Joe's' domestic reputation and diminish the value of its American-held marks. The complaint alleges that Hallatt sells Trader Joe's goods at inflated prices, so customers who shop at Pirate Joe's may come to mistakenly associate Trader Joe's with overpriced goods. Trader Joe's also alleges that Pirate Joe's has inferior customer service, something Trader Joe's believes reflects poorly on its brand. False endorsement gives rise to an actionable harm under the Lanham Act, *see* 15 U.S.C. § 1125(a)(1)(A), and Trader Joe's contends it will suffer this harm in the United States because it draws international shoppers to its northern-Washington stores, and its trademarks stand to lose value in the United States. *See McBee*, 417 F.3d at 119 ("One can easily imagine a variety of harms to American commerce arising from wholly foreign activities by foreign defendants. There could be harm caused by false endorsements, passing off, or product disparagement, or confusion over sponsorship affecting American commerce and causing loss of American sales.").

Finally, Trader Joe's alleges that Hallatt engages in commercial activity in the United States as part of his infringing scheme. *See Reebok*, 970 F.2d at 554–55 (first two *Timberlane* factors satisfied in part because defendant "organized and directed the manufacture of counterfeit REEBOK shoes from the United States"). According to Trader Joe's, Hallatt sources his inventory entirely from the United States: he purchases thousands of dollars of Trader

Joe's goods in the United States and re-sells them in his Canadian store. Hallatt's operation may be assisted in part by his U.S. LPR status, 8 U.S.C. § 1101(a)(27)(A). *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 126 F. Supp. 2d 328, 337 (S.D.N.Y. 2001) (applying Lanham Act to foreign conduct of permanent resident alien who "has resided in and done business in the United States"); *cf. Steele*, 344 U.S. at 285 (explaining that the United States government may regulate American citizens' foreign conduct). The complaint also alleged that Hallatt began hiring third parties in Washington, presumably United States citizens, to purchase Trader Joe's goods on his behalf when Trader Joe's refused to serve him as a customer. This domestic economic activity weighs in favor of applying the Lanham Act to Hallatt's conduct. *See Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 503–04 (9th Cir. 1991) (applying Lanham Act to foreign conduct of California-based corporate defendant).

Hallatt's domestic activity also distinguishes this case from *Love*, the case the district court found dispositive. 611 F.3d at 613. The plaintiff in *Love* (Mike Love, a former member of the Beach Boys) sued several British defendants after they distributed compact discs featuring Love's trademark as cover art. *Id.* at 607. In *Love*, it was undisputed "that all relevant acts occurred abroad" (defendants designed, manufactured, and disseminated the infringing CDs entirely in Europe). *Id.* at 613. Love failed to show that the defendants' conduct directly caused Love "monetary injury in the United States," *id.*, and we affirmed summary judgment in favor of defendants. *Id.* at 613–14. Here, unlike in *Love*, Hallatt executes a key part of his allegedly infringing scheme in the United States, so the causal showing found lacking in

*Love* is satisfied.[9] *See McBee*, 417 F.3d at 118 ("the domestic effect of the international activities may be of lesser importance and a lesser showing of domestic effects may be all that is needed" when defendant engages a scheme involving domestic *and* foreign conduct (discussing *Steele*)).

For these reasons, Trader Joe's satisfied its burden under *Timberlane* prongs one and two, at least at this early stage of the proceeding.

> b. *Timberlane* prong three

The third *Timberlane* prong considers international comity, *see Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 797–98 & n.24 (1993), and gives effect to the "rule that we construe statutes to avoid unreasonable interference with other nations' sovereign authority where possible," *RJR Nabisco*, 136 S. Ct. at 2106–07 & n.9. This prong involves weighing seven factors:

> [1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of business of corporations, [3] the extent to which enforcement by either state can be

---

[9] *Love* also involved a summary judgment motion; we dismissed plaintiff's Lanham Act claim because Love's evidence did not raise a triable issue of fact about whether CD sales in England impacted attendance at Love's concerts in the United States. 611 F.3d at 613. Here, we consider an appeal following a motion to dismiss, and so we accept—without requiring Trader Joe's to prove—that the domestic components of Hallatt's operation impact American commerce. *See Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001) (on a Rule 12(b)(6) motion, we accept as true the facts alleged in the complaint).

> expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir. 1985) (citing *Timberlane*). No one factor is dispositive; each factor "is just one consideration to be balanced." *Wells Fargo*, 556 F.2d at 428. Having considered these factors, we conclude that it is appropriate to apply the Lanham Act to Hallatt and Pirate Joe's.

*Degree of conflict with foreign laws.* Courts typically find a conflict with foreign law or policy when there is an ongoing trademark dispute or other proceeding abroad. *Compare Star-Kist*, 769 F.2d at 1396 (finding conflict when defendant's petition to cancel plaintiffs' Philippine trademark registration was pending in the Philippine Patent Office), *with Am. Rice*, 701 F.2d at 415–16 (finding no conflict when defendant's conduct was lawful under Saudi Arabian trademark law). In 2012, Trader Joe's applied for, and was granted, Canadian recognition for its Trader Joe's trademarks, but there is no pending or ongoing adversarial proceeding between Trader Joe's and Hallatt in Canada. Nor is Trader Joe's engaged in any proceeding (so far as we are aware) relating to its Canadian trademarks. This factor therefore weighs in favor of extraterritorial application.

*Nationality of parties & location of businesses.* This factor typically weighs in favor of extraterritoriality when both parties are United States citizens, or the parties are foreign citizens who operate domestic businesses. *See Reebok*, 970 F.2d at 556 (defendant operated his business from the United States); *Ocean Garden*, 953 F.2d at 504 (both parties were Californian corporations). Trader Joe's is an American corporation with its principal place of business in Monrovia, California. Although Trader Joe's operates no stores in Canada, its trademarks are well-known there. The complaint alleges that Transilvania Trading and Pirate Joe's are (or were) Canadian entities, and that both have (or had) their principal places of business in Vancouver, Canada. As far as we can tell, Hallatt is a Canadian citizen, but because he maintains LPR status in the United States, he subjects himself to the laws of this country. Hallat is also the driving force behind Pirate Joe's. This is not, as Trader Joe's argues, simply a dispute between an American plaintiff and an American defendant, because the complaint alleges that Hallatt is a Canadian citizen who domiciles in Vancouver.[10] But Hallatt's admission that he holds LPR status edges this factor into Trader Joe's' column. *See A.V. by Versace*, 126 F. Supp. 2d at 337 (applying Lanham Act to foreign conduct

---

[10] The complaint's allegation that Hallatt domiciles in Vancouver is inconsistent with Hallatt's claim to LPR status. *Compare* U.S. Citizenship & Immigration Servs., *Maintaining Permanent Residence*, https://www.uscis.gov/green-card/after-green-card-granted/maintaining-permanent-residence (an LPR intentionally abandons his or her status by moving "to another country, intending to live there permanently") (last visited Aug. 19, 2016), *with Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974) ("A change of domicile may be effected only by a combination of two elements: (a) taking up residence in a different domicile with (b) the intention to remain there."). Neither party reconciled this disparity in their briefing or at oral argument.

when defendant was permanent resident alien, had "resided in and done business in the United States for over forty years," and was the driving force behind the corporate defendant), at least at this stage in the proceedings.

*Remedy & enforcement.* The third factor requires us to consider the remedy sought and the extent to which the trial court will be able to enforce its order. *See Ocean Garden*, 953 F.2d at 504. Trader Joe's seeks damages, including disgorgement to compensate for losses incurred as a result of the infringement, and a permanent injunction to prevent Hallatt from using Trader Joe's trademarks, offering Trader Joe's goods for resale, or mimicking Trader Joe's trade dress. There is nothing to suggest that the district court would have difficulty enforcing a damages award against Hallatt: Hallatt is an LPR and Trader Joe's argues he holds assets here. *See Reebok*, 970 F.2d at 557 (finding American court to be in a superior enforcement position vis-à-vis its Mexican counterparts because "[e]ach of the defendants, their principle places of business, and the vast majority of their assets are located in the United States"). And there is no doubt that the district court could stop Hallatt's operation with a domestic injunction because Hallatt sources his goods entirely from the United States. *See Ocean Garden*, 953 F.2d at 504 ("The injunction would be effective against Marktrade because it is a U.S. corporation which 'orchestrated [its] infringing activities'" here (alteration in original) (citation omitted)). The district court could likewise enforce an injunction against Hallatt's foreign conduct if that conduct is found to violate the Lanham Act. *See Steele*, 344 U.S. at 289 ("[T]he District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiciton."); *Ramirez & Feraud Chili Co. v. Las Palmas Food Co.*, 146 F. Supp. 594 (S.D. Cal. 1956) (same),

*aff'd*, 245 F.2d 874 (9th Cir. 1957) (per curiam).  Neither the remedies sought nor the district court's ability to enforce its orders weigh against applying the Lanham Act here.

*Relative significance of effects.*  Trademark law has two goals: "[p]rotect property in the trademark and protect consumers from confusion."    J. Thomas McCarthy, 1 McCarthy on Trademarks & Unfair Competition § 2:1 (4th ed. 2013).  Hallatt's conduct primarily affects the value of Trader Joe's' trademarks in the United States because Trader Joe's holds most of its intellectual property here.  On the other hand, Canadian consumers are the most likely to be deceived by Hallatt's conduct because he displays Trader Joe's marks and sells Trader Joe's goods only in Canada. Federal courts ordinarily do not have an interest in protecting foreign consumers from confusion.  *See McBee*, 417 F.3d at 126.  But Trader Joe's also alleges that its trademarks are well-known in Canada, and that more than forty percent of the credit card transactions at its Bellingham, Washington store are with non-United States residents.  Hallatt's sale of Trader Joe's goods in Canada has the potential to mislead these consumers, so this factor weighs in favor of extraterritorial application.

*Purpose to harm American commerce & foreseeability.* The pleadings, taken in the light most favorable to Trader Joe's, tend to support the conclusion that Hallatt intended to harm Trader Joe's, or, at a minimum, that such harm was foreseeable.  Hallatt chose to name his store "Pirate Joe's," suggesting that he knowingly treads on Trader Joe's' goodwill and pirates Trader Joe's' intellectual property. Indeed, one of Hallatt's employees allegedly admitted that "we're pirating Trader Joe's, sort of."  The complaint further alleges that Trader Joe's disapproved of Hallatt's conduct,

and Hallatt began engaging in subterfuge (such as donning costumes) to purchase goods at Trader Joe's stores without being identified. These factors therefore weigh in favor of extraterritorial application.

*Relative importance of conduct within the United States as compared to conduct abroad.* Trader Joe's alleges, and Hallatt admits, that an essential part of his commercial venture takes place in the United States: Hallatt purchases Trader Joe's products in Washington with the purpose of reselling them in Canada. That Hallatt uses American commerce streams to accomplish his allegedly infringing scheme weighs in favor of applying the Lanham Act to his conduct. But arguably the conduct most important to Hallatt's operation happens in Canada: According to Trader Joe's, Hallatt displays Trader Joe's trademarks on his Canadian store in a way that confuses Canadian consumers, and Hallatt resells Trader Joe's goods—including perishable goods not transported according to Trader Joe's quality control standards—in Canada. Because most of Hallatt's infringing activity occurs abroad, this factor weighs against extraterritorial application to some extent. *See Reebok*, 970 F.2d at 557 (reasoning that the factor would weigh against extraterritorial application when "actual consumer sales of [the infringing] products may have occurred only" abroad); *Star-Kist*, 769 F.2d at 1396 ("The effect on United States commerce from the alleged illegal use of the trademarks in trade between the Philippines and other foreign countries is relatively insignificant compared to the effect on Philippine commerce.").

\* \* \*

In sum, *Timberlane*'s three prongs favor extraterritorial application of the Lanham Act here. On prongs one and two, Trader Joe's alleges a nexus between Hallatt's foreign conduct and American commerce sufficient to state a Lanham Act claim: Hallatt's conduct may cause Trader Joe's reputational harm that could decrease the value of its American-held trademarks, and Hallatt operates in American commerce streams when he buys Trader Joe's goods in Washington and hires locals to assist him. On prong three, the seven subfactors we use to evaluate potential "interference with other nations' sovereign authority," *RJR Nabisco*, 136 S. Ct. at 2107 n.9, taken together, do not counsel against applying the Lanham Act here. We therefore conclude that the Lanham Act reaches Hallatt's allegedly infringing activity, and we reverse the district court's dismissal of Trader Joe's' four Lanham Act claims.

## B. State Law Claims

Trader Joe's next contends the district court erred when it granted Hallatt's motion to dismiss its state trademark dilution and Washington Consumer Protection Act (CPA) claims. We agree with the district court that Trader Joe's failed to state a claim under either statute, and we affirm its order dismissing those claims.

### 1. Trademark dilution

Washington's trademark dilution statute largely mirrors the federal trademark dilution statute. It says:

> The owner of a mark that is famous in this state shall be entitled, subject to the principles of equity and upon such terms as the court

> deems reasonable, to an injunction against
> another person's commercial use in this state
> of a mark, commencing after the mark
> becomes famous, which causes dilution of the
> distinctive quality of the mark, and to obtain
> such other relief as is provided in this section.

Wash. Rev. Code § 19.77.160(1). The district court concluded, and Hallatt maintains on appeal, that Trader Joe's failed to state a claim for relief under this statute because Trader Joe's did not allege that Hallatt used Trader Joe's trademarks in Washington. Trader Joe's counters that "Washington's Antidilution Act requires dilution in Washington, not 'diluting activity' in Washington," and "nothing in the statute suggests this protection is limited to only dilution caused by a defendant's use of a mark within the state." Hallatt has the better argument.

Washington's dilution statute entitles courts to enjoin "commercial *use in this state* of a [famous] mark." Wash. Rev. Code § 19.77.160(1) (emphasis added). The legislature's choice to limit the Antidilution Act's primary remedy to a defendant's use of a famous mark in Washington reflects its intent that the law reach only infringing activities that occur in Washington. *Wash. Dep't of Ecology v. Campbell & Gwinn, LLC*, 43 P.3d 4, 9 (Wash. 2002) ("[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent."). We find no support for Trader Joe's' contrary contention that the Antidilution Act proscribes dilution that occurs abroad and creates a ripple effect in Washington, so we opt for a simpler, more textual reading of the statute: to state a claim for relief under Washington's trademark dilution statute, a plaintiff must allege, *inter alia*,

that the defendant used its mark in Washington. *See* Wash. Rev. Code § 19.77.160(1).[11]

Trader Joe's does not allege that Hallatt uses Trader Joe's trademarks in Washington. To the contrary, Trader Joe's alleges that Hallatt's diluting activity—selling Trader Joe's-branded goods, using Trader Joe's trade dress to decorate his store, displaying the confusingly similar "Pirate Joe's" mark on his storefront—takes place in Vancouver, British Columbia. The complaint does allege that Hallatt purchases Trader Joe's goods in Washington to resell in his store, but this action (while possibly deceptive) is not "commercial *use in this state* of a mark . . . which causes dilution." Wash. Rev. Code § 19.77.160(1) (emphasis added); *see also id.* § 19.77.010(6) (defining dilution); *cf. Sensient Techs.*, 613 F.3d at 762–63 (explaining the concept of "use" in federal trademark law). We agree with the district court that Trader Joe's failed to state a plausible claim for relief under Washington's trademark dilution statute.

## 2. *Consumer Protection Act*

The CPA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code.

---

[11] Trader Joe's urges us to analyze whether Washington's dilution statute applies to Hallatt's conduct as a choice-of-law issue. But this case is not about whether the district court could have applied Canadian law to Hallatt's infringing conduct; it is about whether Trader Joe's stated a claim for violation of a Washington law. *See Haberman v. Wash. Pub. Power Supply Sys.*, 744 P.2d 1032, 1053 (Wash. 1987) (distinguishing "the choice of law to be applied in this case" from "whether [a Washington statute] can be applied extraterritorially to regulate out-of-state transactions").

§ 19.86.020. The CPA's purpose is "to protect the public and foster fair and honest competition." *Id.* To state a claim under the CPA, a plaintiff must allege: "(1) [an] unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986); *Brummett v. Wash. Lottery*, 288 P.3d 48, 54 (Wash. Ct. App. 2012). The parties contest only the second element.

The Washington legislature broadly defines the terms "trade" and "commerce" to include "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." *Hangman Ridge*, 719 P.2d at 535; Wash. Rev. Code § 19.86.010(2). The Washington State Supreme Court recently considered the scope of this statute. *See Thornell v. Seattle Servs. Bureau*, 363 P.3d 587, 589 (Wash. 2015). *Thornell* held that the CPA creates "a cause of action for a plaintiff residing outside of Washington to sue a Washington corporate defendant for allegedly deceptive acts." *Id.* at 589, 592. The CPA likewise creates a cause of action for an out-of-state plaintiff against an out-of-state defendant for the allegedly deceptive acts of the defendant's in-state agent. *Id.* at 592; *see also Red Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1091 (9th Cir. 2011) (Washington's Franchise Investment Protection Act creates cause of action for out-of-state plaintiff to sue Washington company). *Thornell* reasoned that a contrary holding would permit Washington companies to subvert CPA liability by targeting out-of-state consumers, and that such a result would thwart a primary purpose of the Act:

> Washington businesses engaging in unfair and deceptive practices that indirectly affect others do not advance the purpose of fair and honest competition. Honest businesses could be placed at a competitive *disadvantage* competing against a business that generates revenue from unlawful acts that violate the statute.

363 P.3d at 591.

*Thornell* holds that the CPA applies broadly, but its holding does not encompass Hallatt's conduct. Here, unlike in *Thornell*, none of the defendants are Washington residents: the complaint alleges that Hallatt is a Canadian citizen domiciled in Vancouver, Canada,[12] and Pirate Joe's has its principal place of business in Canada. *Cf. Thornell*, 363 P.3d at 589. Trader Joe's is a California corporation, so to the extent Hallatt's conduct diminishes the value of its trademarks, that harm is not a Washington-based harm. Given the status of the parties in this case, *Thornell*'s justification for applying the CPA extraterritorially—that it may be applied to combat deceptive practices of Washington businesses—would not be served by applying it here. *See Red Lion*, 663 F.3d at 1090 (noting that a Washington law would not apply extraterritorially when neither party is a Washington resident and the acts giving rise to the claim occurred outside of Washington). Nor did Trader Joe's plausibly allege that Hallatt's activity harms "the people of the state of Washington." *Cf. Hangman Ridge*, 719 P.2d at 535. The primary theory of Lanham Act infringement in this

---

[12] Although Hallatt admitted he is an LPR, Trader Joe's did not allege that he lives in Washington State.

case, the quality control theory, is based on harm to Trader Joe's reputation, not consumer confusion. The deceptive practices claim centers on Hallatt's attempt to pass-off his store as a Trader Joe's store, but this deception allegedly occurs only in Canada and therefore harms only Canadian consumers. Finally, unlike in *Thornell*—where defendant's competitive practices gave it a competitive advantage over honest Washington businesses—Trader Joe's' complaint did not allege that the existence of a low-quality, high-cost Trader Joe's knock-off store in Vancouver puts honest Washington grocery stores at a competitive disadvantage. *Cf. Thornell*, 363 P.3d at 591. The district court properly dismissed this claim.

## CONCLUSION

We conclude that the Lanham Act applies to Hallatt's allegedly infringing conduct, but that the district court properly dismissed Trader Joe's' state law claims. We therefore **REVERSE** dismissal of the federal claims, **AFFIRM** dismissal of the state claims, and **REMAND** for further proceedings. The district court's judgment is **REVERSED** in part, **AFFIRMED** in part, and **REMANDED**. Each party shall bear its own costs.